UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
DANIEL HANNA and WILLIAM WEST

                       **Plaintiffs,**                    <u>**COMPLAINT**</u>

                                                     **JURY TRIAL DEMAND**

      **v.**

                                                     **ECF CASE**

THE CITY OF NEW YORK, LT. CHRISTOPHER
RIORDAN, Individually and in his Official Capacity,
CPT. BRENDAN CORRIGAN, Individually and in his
Official Capacity, CPT. BRENDAN FOGARTY,
Individually and in his Official Capacity, LT.
SALVATORE SODANO, Individually and in his
Official Capacity,

                       **Defendants,**

----------------------------------------------------------------------X

        Plaintiffs DANIEL HANNA and WILLIAM WEST, by their attorneys, COHEN &

FITCH LLP, complaining of the defendant, respectfully allege as follows:

<u>**INTRODUCTION**</u>

        1.     This is an action seeking monetary relief (including past and ongoing economic

loss), compensatory and punitive damages, disbursements, costs, fees, and other damages for

violations of plaintiffs' rights brought pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000(e), 42 U.S.C. §1981, New York Executive Law § 296, the New York State Human

Rights Law, Executive Law § 290 *et seq.* ("Human Rights Law" or "NYSHRL"); and the

Administrative Code of the City of New York § 8-101 *et seq.* ("City Law" or "NYCHRL"),

intentional infliction of emotional distress, and negligent infliction of emotional distress.

        2.     Plaintiffs allege that they were subjected to discrimination, denied the equal terms,

conditions, and privileges of employment, subjected to a hostile work environment, retaliated

against and deprived pay on account of their race by defendants THE CITY OF NEW YORK,

RIORDAN, CORRIGAN, FOGARTY, and/or SODANO.

3.      Plaintiffs allege that defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO intentionally and purposefully discriminated against plaintiffs based on their race and that said defendants inflicted emotional distress upon plaintiffs, intentionally, and/or negligently.

4.      Plaintiffs further allege that the discrimination was intentional and was the substantial and/or motivating factor in interfering with plaintiffs' employment.

## JURISDICTION AND VENUE

5.      The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1334, because this is an action arising under the laws of the United States, specifically Title VII.

6.      This Court is requested to exercise pendent jurisdiction with respect to plaintiffs' New York State and New York City law claims pursuant to 28 U.S.C. § 1367.

7.      Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b) and 1391(c) and because this is the place where the unlawful employment practices occurred.

8.      On September 22, 2022, the Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue as to Plaintiff Hanna. On October 24, 2022, the EEOC via the U.S. Department of Justice, issued a Notice of Right to Sue as to Plaintiff West. Plaintiffs filed this Complaint within ninety (90) days of when they received said Notices.

9.      Plaintiff will serve a copy of the complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York upon filing in accordance with N.Y.C. Admin. Code § 8-502(c).[1]

---

[1] Since this action is brought against the CITY OF NEW YORK, the CITY OF NEW YORK will be served with this Complaint in connection with plaintiffs' obligations under F.R.C.P. 4, which will also satisfy plaintiffs' obligations under N.Y.C. Admin. Code § 8-502(c).

## PARTIES

### *Plaintiffs*

10.     Plaintiff DANIEL HANNA is an African American male. He currently resides in Queens, New York, and is, and has been employed by defendant THE CITY OF NEW YORK, New York City Fire Department ("FDNY") since 2003.

11.     Plaintiff WILLIAM WEST is an African American male. He currently resides in Queens, New York, and is, and has been employed by defendant THE CITY OF NEW YORK, New York City Fire Department ("FDNY") since 2001.

12.     At all times relevant to this complaint, plaintiffs Hanna and West were and are employed as FDNY firefighters for defendant THE CITY OF NEW YORK.

13.     Plaintiffs, Hanna and West were at all times "individuals" within the meaning of the Human Rights Law, protected from discrimination on the basis of race.

14.     Plaintiffs Hanna and West were at all times "persons" within the meaning of the City Law, protected from discrimination on the basis of race.

### *Defendants*

15.     Defendant, THE CITY OF NEW YORK, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

16.     Defendant, THE CITY OF NEW YORK, maintains the New York City Fire Department ("FDNY"), a duly authorized public authority and/or fire department, authorized to perform all functions of a fire department, acting under the direction and supervision of the aforementioned municipal corporation, The City of New York.

17.     That at all times hereinafter mentioned the individually named defendants/supervisory personnel, defendants RIORDAN, CORRIGAN, FOGARTY, and/or

SODANO were duly sworn firefighters of said department and were acting under the supervision of said department and according to their official duties.

18.     That at all times hereinafter mentioned the defendants/supervisors, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages, policies, and/or practices of the State or City of New York.

19.     That at all times hereinafter mentioned the defendants/supervisors, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO were plaintiffs' supervisors.

20.     Each and all of the acts of the defendants/supervisors, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO, alleged herein were done by said defendants/individuals while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

21.     Each and all of the acts of the defendants/supervisors, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO, alleged herein were done by said defendants/individuals while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

22.     At all relevant times, defendant THE CITY OF NEW YORK controlled the terms and conditions of plaintiffs' employment and was and is an "employer" within the meaning of the NYSHRL, NYCHRL, and the aforementioned Federal Laws.

## FACTUAL ALLEGATIONS

### Brief History of Recent FDNY Race Discrimination Lawsuits

23.     The FDNY has a long and well-documented history of race discrimination against minority firefighters, which has been the subject of numerous articles, scholarly writings, and

4

books.[2]

24.     In 2007, the United States Department of Justice ("DOJ") filed a lawsuit against defendant CITY OF NEW YORK alleging that the City's entry-level firefighter exams and applicant ranking had an unlawful disparate impact on African-American and Hispanic applicants.[3]

25.     The Vulcan Society and several individuals intervened in the lawsuit alleging similar claims of disparate impact and also alleging disparate treatment on behalf of a putative class of African-American, entry firefighter candidates. (See id. at Fn. 2)

26.     On March 18, 2014, the U.S. Department of Justice ("DOJ") announced that defendant THE CITY OF NEW YORK agreed to pay $98 million to resolve these racial discrimination claims (See id. at Fn.2).[4]

27.     Unfortunately, however, since the aforementioned 2014 settlement, defendant CITY OF NEW YORK has been sued numerous times by minorities alleging race discrimination within the FDNY.

28.     For example, in December of 2017, a group of civilian African American workers filed a lawsuit against defendant THE CITY OF NEW YORK claiming they were denied promotions and equal pay.[5]

29.     In 2018, another lawsuit was filed against defendant THE CITY OF NEW YORK by an African-American man who was twice denied entry into the FDNY, while Joseph Cassano,

---

[2] See e.g. Black Firefighers and the FDNY: The Struggle for Jobs, Justice, and Equity in New York City by David Golberg, published by the University of North Carolina Press in 2017, https://uncpress.org/book/9781469661469/black-firefighters-and-the-fdny/.

[3] See https://www.workplaceclassaction.com/2014/03/new-york-city-agrees-to-pay-98-million-to-settle-high-profile-fdny-discrimination-class-action/).

[4] See also, https://nypost.com/2014/03/18/de-blasio-agrees-to-98m-fdny-discrimination-suit-settlement/

[5] See https://abc7ny.com/fdny-race-discrimination-lawsuit-african-american/2748803/ and https://nypost.com/2017/12/04/fdny-sued-for-discrimination-again/

the white son of a former fire commissioner, graduated from the FDNY academy despite a history of racist rants on social media.[6]

30.     In 2020, five (5) FDNY fire protection inspectors filed a class-action lawsuit accusing defendant THE CITY OF NEW YORK of paying them less than department of building inspectors on the basis of race.[7]

31.     Then again in 2021, a Black FDNY firefighter filed a federal lawsuit against defendant THE CITY OF NEW YORK alleging that he was suspended for opposing his boss' call to turn fire hoses on George Floyd protesters in 2020 and retaliated against by the FDNY following a May 2020 confrontation with his supervisor over the Floyd protests and his continued outspokenness over racism in the FDNY.[8]

32.     While this is not a complete accounting of all of the recent lawsuits filed against defendant THE CITY OF NEW YORK concerning race discrimination within the FDNY, the sheer number of race-based lawsuits is evidence that racism was, and continues to be a problem within the FDNY.

### Specific Allegations of Plaintiff Daniel Hanna

33.     Plaintiff, Daniel Hanna, is a forty-six (46) year old African-American firefighter ("FF") who has been employed by the City of New York, New York City Fire Department ("FDNY" or "the Dept.") for approximately nineteen (19) years, since 2003.

34.     Plaintiff Hanna's current rank is Firefighter 1st Grade and prior to the discrimination detailed herein, he used to serve as a chauffeur for his firehouse on account of his

---

[6] See *https://www.silive.com/news/2018/05/post_2146.html*
[7] See *https://nypost.com/2020/05/01/fdny-inspectors-paid-less-than-building-inspectors-due-to-race-suit/*
[8] See *https://www.nydailynews.com/new-york/ny-fdny-discrimination-lawsuit-20210907-yizbj6n7kjhkfpjnoiyt2qkefq-story.html* and *https://www.nytimes.com/2021/10/01/nyregion/fdny-racism-scandal.html*

performance record and senior status. During his time with the FDNY, plaintiff Hanna has had an exemplary performance record.

35.    Since approximately 2003, plaintiff Hanna has worked out of the firehouse which contains Engine Company 311 (and shares a house with Truck/Ladder Company 158) as a member of Engine Company 311.[9]

36.    During that time, plaintiff Hanna attained senior status and become one of several senior firefighters who are black. However, this change of seniority, from leadership that was previously all white to leadership that was now becoming increasingly diverse, created tension and a hostile work environment for plaintiff Hanna and other black firefighters in the firehouse at the hands of white firefighters. In the face of this newly diverse leadership, multiple white firefighters in the house, including those in leadership positions, became angry and uncomfortable about the fact that black firefighters were gaining senior status.

37.    As a result, those white firefighters began to engage in an unlawful campaign of harassment and retaliation towards plaintiff Hanna and other black firefighters who worked out of firehouse 311/158, which has caused plaintiff Hanna and others to lose respect, suffer embarrassment, and lose wages through demotion or other means.

38.    By way of background, when plaintiff Hanna joined Engine Company 311 in 2003, he was the first and only black firefighter in the house. However, over the years, the number of black firefighters in his firehouse has grown. Moreover, due to his exemplary performance, by 2012, plaintiff Hanna had become one of the senior firefighters in his house.

---

[9] However, as will be discussed more fully *infra*, plaintiff Hanna was re-assigned to Engine Company 314 at a different firehouse and was demoted and stripped of his chauffeur position on account of racial harassment and retaliation, causing him to lose wages, until on or about April 3, 2022, when he was finally allowed to return to Firehouse 311/158 and resume his regular duties.

39.     At the time, plaintiff Hanna was the only black firefighter in the house in a senior leadership position. Nevertheless, by 2017 the demographics of the house began to change as more black firefighters moved into senior positions. Once this occurred, many of the white firefighters in the house became upset about the fact black firefighters were in positions of leadership and wanted to change house seniority rules to put more white firefighters in positions of power.

40.     Thereafter, in or around 2018, a new captain, Captain Rodgers, was assigned to Ladder Company 158 (in the same firehouse as Engine Company 311). Upon his assignment, plaintiff Hanna began to observe racial animus from Cpt. Rodgers towards a black firefighter.

41.     Specifically, Cpt. Rodgers began giving better assignments and training to young white firefighters while neglecting to give training to and giving poor assignments to a young black firefighter in the house.

42.     In addition, during this time, there were multiple incidents of racial conflict concerning Cpt. Rodgers and several instances where Cpt. Rodgers treated black firefighters, including plaintiff Hanna, in a way that he would never treat his white counterparts.

43.     For example, on one occasion, Cpt. Rodgers demanded that plaintiff Hanna and the other black firefighter in the house make his coffee, a task he would *never* ask a similarly situated white firefighter to do. In addition, upon Cpt. Rodger's departure from the firehouse (311/158), he began spreading rumors that plaintiff Hanna and the other black firefighters were running a "black ring" out of the firehouse.

44.     In addition, Cpt. Rodgers spread other rumors specifically about plaintiff Hanna – namely, that plaintiff Hanna had given orders to other black firefighters in the house to put water in his boots and to feed him "black food" such as oxtail and beef patties.

45.     Subsequently, after Cpt. Rodgers's departure, the racial harassment continued under Lieutenant Riordan. Specifically, in or around the summer of 2019, as more black firefighters gained senior status, some of the black firefighters, including plaintiff West were notified that their group (the monthly dates they are scheduled to work) was being changed, and were not given any business justification, nor any justification whatsoever, for these changes.

46.     Upon being notified about his group change by Lt. Riordan (a white firefighter), plaintiff West requested that plaintiff Hanna (who was now the senior black firefighter in his company) accompany him to report the change in schedule to Captain O'Hara (another white firefighter), who was the captain of his company, Engine 311.

47.     During that meeting, it became apparent that Lt. Riordan had lied about the reason for the group change, as he had no basis for making said change, rather he was acting with racial animus towards plaintiff West and other senior black firefighters, such as plaintiff Hanna, who had achieved or were entering into senior status.

48.     Likewise, it further became apparent that the only reason for the change, was a concerted effort to split up plaintiff West and plaintiff Hanna as they were the two (2) senior black members of the firehouse. Upon information and belief, the white leadership and the other white firefighters did not approve of the fact black firefighters were entering into more senior status and would now have more say and oversight of the operations of the firehouse.

49.     In addition, in or around July of 2019, and in the months that followed, this hostile and racially biased work environment continued when Lt. Riordan changed the long-established "Nozzle Policy" (see plaintiff West allegations, *infra*) to deprive plaintiff West and other black senior members from the nozzle position they had rightfully earned as a result of their senior status.

50.     Thereafter, Lt. Riordan held a meeting with the firefighters on his tour to inform them of this new policy he was implementing, which would negatively affect senior black firefighters. However, at no time prior to this change, did Lt. Riordan speak with the senior firefighters of the company, who were black, including plaintiff Hanna, to discuss this change as was the normal practice when senior firefighters were white.

51.     Following this meeting, plaintiff Hanna and other senior black firefighters felt disgusted, disrespected, and targeted on account of their race. In addition, during this time period, plaintiff Hanna, plaintiff West, and other senior black firefighters became aware that Lt. Riordan was spreading rumors about them, by telling white firefighters that they were "lazy" and didn't want to do drills.

52.     Additionally, in or around March of 2019, a new captain, Cpt. Corrigan was assigned to the firehouse to replace Cpt. Rodgers.

53.     Shortly after his assignment, plaintiff Hanna was notified by another black firefighter, who was stationed at the firehouse where Cpt. Corrigan had previously been assigned, to "watch out" because Cpt. Corrigan had engaged in racial animus towards black firefighters in that firehouse before his re-assignment. Likewise, plaintiff Hanna attempted to keep his distance from Cpt. Corrigan as he did not want to have racial conflict with Cpt. Corrigan.

54.     Thereafter, in or around the Spring of 2020, plaintiff Hanna was approached by another black firefighter, non-party FF Caines, who advised plaintiff Hanna that he felt threatened because Cpt. Corrigan was publicly disparaging him in front of white firefighters by telling everyone he was incompetent.

55.     This pattern only repeated itself, in or around the Summer of 2020, when the firefighters were at a drill wherein plaintiff West was reviewing various firefighting scenarios with

other firefighters and Cpt. Corrigan began to humiliate plaintiff West in front of other firefighters, including plaintiff Hanna, by starting a public argument with him about tactics, despite the fact Cpt. Corrigan would never and had never done such a thing to white firefighters in the company.

56.     In addition, in connection with this argument, Cpt. Corrigan insulted plaintiff West in front of others and implied that he was incompetent and that more junior firefighters should not listen to him, despite the fact plaintiff West was a long-time member of the FDNY with senior status who was often tasked with mentoring junior firefighters.

57.     Moreover, in or around the same time, multiple white firefighters began to seek transfers out of firehouse 311/158, with at least one white firefighter claiming he didn't want to work in "niggerville."[10]

58.     That same summer, 2020, plaintiff Hanna was notified by non-party FF Caines that FF Caines' performance evaluation, which upon information and belief, was completed by Cpt. Corrigan was lower than usual in that FF Caines had not received the satisfactory performance grades that he had previously received despite the fact his performance was no worse than in the past and more importantly, despite the fact white firefighters who did not perform as well as FF Caines had received higher grades.

59.     As such, plaintiff Hanna went to look at his review, only to find out upon reviewing same, that he too had been given lower performance grades than he had ever gotten, grades that are normally reserved for more junior members and never given to senior firefighters such as plaintiff Hanna.

60.     As a result, plaintiff Hanna (and other black firefighters in the house) felt insulted, disrespected, and discriminated against as it appeared that the black firefighters had received lower grades than their white counterparts, despite making up the majority of the firehouse leadership.

_____
[10] Plaintiff Hanna was told that this term was used by a white firefighter to describe the firehouse.

61.     Subsequently, in or around October 2020, another racially charged incident occurred involving Cpt. Corrigan, plaintiff Hanna, plaintiff West, and FF Caines, during which Cpt. Corrigan falsely accused plaintiff West of engaging in behavior against Lieutenant Sodano (who is also white) that never occurred to continue his campaign of race-based harassment and retaliation towards these black firefighters.

62.     Specifically, and as detailed in the specific allegations of plaintiff West, *infra*, on this particular day, plaintiff Hanna, had been assigned a detail. However, it was customary that when a senior firefighter, such as plaintiff Hanna was assigned a detail, they could choose to take the detail themselves or hand it off to a less senior member.

63.     Likewise, plaintiff Hanna decided to assign his detail to a more junior black firefighter, FF Caines. Moreover, at the time, FF Caines' supervisor, Lt. Salvatore Sodano, did not initially seem to have any issue with plaintiff Hanna assigning the detail, as this was often done.

64.     In connection with this detail, FF Caines left the firehouse to travel to said detail. However, at some point, FF Caines became aware that the detail was actually in another location. As such, FF Caines returned to the firehouse to retrieve a change of clothes and then anticipated heading out to the newly assigned location.

65.     Nevertheless, when FF Caines returned to the firehouse, with no explanation or justification, Lt. Sodano all of sudden started to take issue with the assignment of the detail. As a result, plaintiff Hanna went to speak with Lt. Sodano and advised him that if there was going to be an issue with the assignment to FF Caines, he would just take the detail himself.

66.     At this time, Lt. Sodano responded by arguing with plaintiff Hanna and advising him that he was not in a position to discuss the situation further. However, plaintiff Hanna advised Lt. Sodano that he was in fact involved in the situation as it was his detail.

67.     In response, the firefighters in the house began to discuss their concerns about details being re-assigned. They believed that the detail issue concerning FF Caines was racially motivated and done for the sole purpose of depriving him (a black firefighter) of receiving the experience and extra pay that comes along with detail assignments.

68.     On account of this conversation, the firefighters ended up eating their meal late. Several weeks later, upon information and belief, Cpt. Corrigan and/or Lt. Sodano filed a false and pretextual complaint against plaintiff West, claiming, among other things that plaintiff West purposely caused Lt. Sodano and the other firefighters in the house to eat a late meal and that I plaintiff West had "spiked" his food with hot sauce (despite the fact there was no evidence to support either contention and in fact evidence to the contrary concerning both allegations).

69.     Several days after plaintiff West was charged with misconduct in connection with the "meal incident," *infra,* plaintiff Hanna attempted to speak with Cpt. Fogarty about the false allegations and charges being leveled against plaintiff West.

70.     During this meeting and two (2) meetings that followed between plaintiff Hanna and Cpt. Fogarty, plaintiff Hanna expressed concern regarding the false accusations that had been made against plaintiff West on account of Cpt. Corrigan's racial animus towards himself, plaintiff West, and the other black firefighters in the house.

71.     However, during these meetings, Cpt. Fogarty advised plaintiff Hanna that there was nothing he could do about it and further advised plaintiff Hanna to stay out of it.

72.     However, as the most senior black firefighter in the house, plaintiff Hanna felt as though he could not and would not just stand by while white leadership engaged in unlawful and discriminatory conduct.

73.     Likewise, plaintiff Hanna advised plaintiff West to list him as a witness on his EEO complaint, as he was happy to testify on plaintiff West's behalf about the ongoing racial discrimination and hostile work environment at the firehouse, and in or around November of 2020, plaintiff West filed his EEO complaint.

74.     Following the filing of plaintiff West's EEO complaint, and during the time that the EEO was investigating the incident, between approximately November 2020 and approximately June 2021, Cpt. Corrigan and Cpt. Fogarty began to institute other changes to firehouse policies and procedures which had effects on plaintiff West and other senior black firefighters in the house.

75.     For example, the procedure for which company (engine v. truck/ladder) leaves the house first during an emergency was changed without a conversation with the senior firefighters (most of whom are black) and in direct contravention of the way things had been done when the senior firefighters in the house were white.

76.     More importantly, this change has affected the firefighters who drive department vehicles, who are mostly black, and therefore could put them at a disadvantage for advancement.

77.     In response, plaintiff Hanna attempted to set up multiple meetings with Cpt. Corrigan and Cpt. Fogarty but was advised that Cpt. Corrigan refused to meet with him to discuss the situation.

78.     In addition, Cpt. Fogarty, Cpt. Corrigan and other white firefighters continued to engage in a campaign of harassment against plaintiff Hanna and other black firefighters at the 311/158 firehouse, by, among other things, changing procedures and refusing to meet with senior black leadership to discuss these changes, which was the norm when senior leadership was white.

79.     Subsequently, on or about June 1, 2021, plaintiff Hanna was approached by another white firefighter, FF Ferrara, who cursed at him, tried to start a fight with him, and falsely accused

14

him of trying to create problems for Cpt. Corrigan even though Cpt. Corrigan was actually at the helm of the continued racially-based campaign of harassment towards plaintiff Hanna and other black firefighters.

80.     Several days later, on or about June 3, 2021, (and just four (4) days before plaintiff Hanna was scheduled to meet with the EEO to testify on plaintiff West's behalf about the racially charged "meal incident" (see plaintiff West allegations, *infra*), and in retaliation on account of the fact plaintiff Hanna was set to meet with the EEO about Cpt. Corrigan, upon reporting for duty, plaintiff Hanna was notified by Cpt. Fogarty that he had to report to the medical office to be evaluated.

81.     Upon being directed to the medical office, plaintiff Hanna became confused as to why he needed to report to the medical office to be evaluated as there was nothing medically wrong with him and he was fit for duty.

82.     However, Cpt. Fogarty advised plaintiff Hanna that it was a direct order. Likewise, plaintiff Hanna compiled and reported to the medical office.

83.     Moreover, this directive was completely out of the ordinary as in his almost twenty (20) years with the FDNY, plaintiff Hanna had never seen or even heard of a firefighter being told to report to the medical office when there was nothing wrong, and thus it became evident that this was just retaliation against him to deny him the opportunity to meet with the EEO on plaintiff West's behalf or discredit him in some way.

84.     Upon reporting to the medical office, plaintiff Hanna was examined by a doctor for the FDNY, who medically cleared him to return to duty as there was nothing wrong with him and no reason for him to be sent to the medical office other than in retaliation for plaintiff Hanna agreeing to speak with the EEO on plaintiff West's behalf.

85.     Following his medical clearance, plaintiff Hanna returned to the firehouse, where he was again met by Cpt. Fogarty, who advised him, in sum and substance, that since plaintiff Hanna "wanted to do things the hard way" he was being re-assigned to a different firehouse (Engine 314) and thus, was being demoted from his chauffeur position and that he was being brought up on various disciplinary charges despite having committed no wrongdoing.

86.     However, the only reason for these bogus disciplinary charges was on account of plaintiff Hanna's race and his willingness to meet with the EEO on plaintiff West's behalf and to prevent plaintiff Hanna from attending the EEO meeting.

87.     Following the meeting with Cpt. Fogarty wherein these false and retaliatory disciplinary charges were brought against plaintiff Hanna, he reported to Engine 314 to begin his re-assignment, while continuing to contest same, as there was no basis for it aside from the discriminatory and retaliatory conduct of Cpt. Corrigan, Cpt. Fogarty, and other white firefighters at firehouse 311/158.

88.     Five (5) days later, on or about June 8, 2021, plaintiff Hanna was notified that the disciplinary charges against him were being dropped. Likewise, plaintiff Hanna requested to know when he could return to firehouse 311/158.

89.     However, at this time, plaintiff Hanna was advised that he would remain at Engine 314 for another thirty (30) days, despite there being no non-pretextual reason for his re-assignment and despite the fact he could not work as a chauffeur, causing him to lose wages.

90.     In addition, upon his re-assignment to Engine 314, aside from being demoted, plaintiff Hanna was also humiliated, by being forced to work details reserved for junior firefighters despite his senior status.[11]

---

[11] Plaintiff Hanna also filed his own internal EEO complaint in connection with these incidents.

91.    Thereafter, on or about August 3, 2021, plaintiff Hanna contacted his union representative about the fact he was still assigned to Engine 314. However, despite plaintiff Hanna's efforts in trying to return to his firehouse (311/158), plaintiff Hanna was assigned to Engine 314, where *inter alia*, he was demoted, was unable to work as a chauffeur, and was forced to do details normally reserved for junior members, until on or about April 3, 2022, when he was finally permitted to return to firehouse 311/158 and resume his regular duties.

92.    Moreover, on or about January 13, 2022, plaintiff Hanna was informed that the internal EEO investigation had gone in his favor as the EEO found that he was in fact retaliated against for exercising his rights.

93.    Nonetheless, and despite this and his numerous requests to return, plaintiff Hanna was not re-assigned to his firehouse (311/158) until on or about April 3, 2022.

*Specific Allegations of Plaintiff William West*

94.    Plaintiffs repeat, reiterate, and re-allege all paragraphs above as though fully set forth herein.

95.    Plaintiff William West is a forty-two (42) year old African-American firefighter ("FF") who has been employed by the City of New York, New York City Fire Department ("FDNY" or "the Dept.") for approximately twenty-one (21) years, since 2001.

96.    Plaintiff West's current rank is Firefighter 1st Grade and he also serves as the African-American Outreach Coordinator for the Dept. During his time with the FDNY, plaintiff West has had an exemplary performance record.

97.    For approximately the past ten (10) years, plaintiff West has worked out of the firehouse which contains Engine Company 311 (and shares a house with Truck/Ladder Company 158) as a member of Engine Company 311.

98.     During that time, plaintiff West attained senior status and become one of several senior firefighters who are black. However, this change of seniority, from leadership that was previously all white to leadership that was now becoming increasingly diverse, created tension and a hostile work environment for plaintiff Hanna, as detailed *supra*, and other black firefighters in the firehouse at the hands of white firefighters.

99.     In the face of this newly diverse leadership, multiple white firefighters in the house, including those in leadership positions, became angry and uncomfortable about the fact that black firefighters were gaining senior status.

100.    As a result, those white firefighters began to engage in an unlawful campaign of harassment and retaliation towards plaintiff West and other black firefighters who worked out of Firehouse 311/158, which has caused plaintiff West and others to lose respect, suffer embarrassment, and lose wages through demotion or other means.

101.    Beginning in the summer of 2019, as plaintiff West became more senior, he was notified that his group (the monthly dates he was scheduled to work) were being changed, and was not given any business justification, nor any justification whatsoever, for these changes.

102.    Upon being notified about his group change by Lieutenant Riordan (a white lieutenant), plaintiff West requested that the senior black firefighter in his company, plaintiff Hanna, accompany him to report the change in schedule to Captain O'Hara (another white firefighter), who was the captain of his company, Engine 311.

103.    During that meeting, it became apparent that Lt. Riordan had lied about the reason for the group change, as he had no basis for making said change, rather he was acting with racial animus towards plaintiff West and other senior black firefighters, such as plaintiff Hanna, who were entering into senior status.

104.     Likewise, it further became apparent that the only reason for the change, was a concerted effort to split up plaintiff West and plaintiff Hanna as they were the two (2) senior black members of the firehouse and white leadership and the other white firefighters did not approve of the fact black firefighters were entering into more senior status and would now have more say and oversight of the operations of the firehouse.

105.     In addition, in connection with the group change, a white probationary firefighter in the company was notified about the group change before plaintiff West was, in a further effort to embarrass him.

106.     In addition, at the time, other white firefighters had far less seniority than plaintiff West and thus should have been subjected to a group change before FF West but were not re-assigned.

107.     Subsequently, on or about July 11, 2019, and in the months that followed, this hostile and racially biased work environment continued towards plaintiff West, when a long-standing firehouse tradition, which many senior white firefighters had partaken in over the previous years, the "Nozzle Policy," was changed, to preclude plaintiff West, the most senior eligible, but also black, firefighter.

108.     Specifically, it had long been the "Nozzle Policy" that the senior firefighter in the group would be assigned to the prestigious nozzle position. However, once plaintiff West became the senior firefighter in the group and thus expected to be assigned the nozzle position, Lt. Riordan all of a sudden decided he was now going to implement a new, never before used equation to determine who would be assigned the position, thereby depriving plaintiff West of the position that he had rightfully earned as a result of his senior status on account of the fact he is black.

109.    Moreover, this change was abruptly and publicly made before other firefighters causing plaintiff West distress and further embarrassment.

110.    Thereafter, Lt. Riordan held a meeting with the firefighters on his tour to inform them of other changes he was implementing which could negatively affect black firefighters. However, at no time prior to this did Lt. Riordan speak with the senior firefighters of the company, who were black, to discuss these changes as was the normal practice when senior firefighters were white.

111.    Following this meeting, plaintiff West and other senior black firefighters felt disgusted, disrespected, and targeted on account of their race.

112.     In addition, during this time period, plaintiff Hanna, plaintiff West, and other senior black firefighters became aware that Lt. Riordan was spreading rumors about them, by telling white firefighters that they were "lazy" and didn't want to drill.

113.    Sometime after the racially charged incidents with Lt. Riordan, plaintiff West went out on leave due to a personal family issue.

114.    While plaintiff West was out on a leave, there was a change in procedure regarding overtime ("OT") which capped discretionary OT at thirty (30) hours. However, because plaintiff West was on leave, he did not realize this change had become effective nor did anyone inform him of same.

115.    Moreover, in connection with his position as the African American Outreach Coordination ("AAOC"),[12] plaintiff West was often required to do discretionary OT. Likewise, without realizing he had done anything wrong, plaintiff West accrued over 30 hours' worth of discretionary OT.

_____

[12] As the AAOC, plaintiff West was responsible for helping to oversee African American recruitment within the FDNY. He was tasked with helping African Americans who wanted to become FDNY members with their applications, and community outreach, among other things.

116.    As a result of this overage, the FDNY was supposed to notify plaintiff West in writing that he violated the new OT policy so that he had an opportunity to correct this issue. However, rather than following the proper procedure to notify him of this issue, upon information and belief, Lt. Riordan and/or other white firefighters engaged in a concerted effort wherein they conspired to hide said notification so that plaintiff West would get in trouble for violating same.

117.    Instead of providing plaintiff West with the initial notice in the time period allotted to provide same, said firefighters failed to follow proper notification procedures and then on or about October 16, 2019, forged plaintiff West's signature to an official notification document. As a result, plaintiff West remained unaware he violated the OT policy.

118.    Subsequently, on or about October 31, 2019, plaintiff West was called in for a meeting regarding his violation of the OT policy and informed, for the very first time, that he was receiving a second notice of violation. However, during this meeting, plaintiff West disputed ever receiving the first notification and made clear that the signature on the first notification was not in fact his signature as he had never signed the document.

119.    Likewise, it became clear, that the white firefighters were purposely and with discriminatory motives, engaging in a campaign of harassment and trickery to get plaintiff West disciplined in connection with the OT policy so that he would be unable to work as the AAOC.

120.    Moreover, by the time this "2nd notification" which was really the first notification plaintiff West had received was provided to him, he was already in violation of the OT policy for a third time (despite having never received the first notification nor being aware he violated the OT policy), and a third letter had already been sent to him regarding the fact he was going to be issued a Command Discipline ("CD") for violating the OT policy.

121.     As a result, on or about November 19, 2019, and as a direct result of the racial harassment and retaliation, plaintiff West was issued a CD for six (6) months, which prevented him from continuing to work as the AAOC and caused him to suffer lost wages and further embarrassment.

122.     In fact, to this day, plaintiff West still holds the title of AAOC. However, following the expiration of his CD, FF West has not been contacted by the FDNY Recruitment Department to engage in the activities he was previously engaged in as the AAOC and since that time, has reached out to the Department to inquire about a return to his normal duties in the AAOC position, but to date, has never received a response aside from the Department advising FF West that they would "get back to him."

123.     Likewise, despite currently holding the title in name and being capable, ready, willing, and able to perform his duties as the AAOC, other firefighters were added to his stead and have taken on his duties as a result of this falsely applied CD. Thus, plaintiff West has been unable to actually work as the AAOC since his CD expired, causing him to suffer emotional and compensatory harm, *inter alia*, lost wages.

124.     Following these incidents, in or around the Summer of 2020, while at a drill, plaintiff West was reviewing various firefighting scenarios with other firefighters in Engine Company 311, when another white firefighter, Captain Corrigan, humiliated plaintiff West in front of other firefighters (including plaintiff Hanna) by starting a public argument with him about tactics, despite the fact Cpt. Corrigan would never and had never done such a thing to white firefighters in the company.

125.     In addition, in connection with this argument, Cpt. Corrigan insulted plaintiff West in front of others and implied that he was incompetent.

22

126.    Later that week, plaintiff West became aware that Cpt. Corrigan was warning junior firefighters not to listen to plaintiff West, despite the fact plaintiff West was a long-time member of the FDNY with senior status who was often tasked with mentoring junior firefighters.

127.    This was even more out of the ordinary as when there had been disagreements between Cpt. Corrigan and white firefighters in the past, he had always discussed them privately and not disparaged them publicly in front of other firefighters.

128.    Thereafter, in or around October 2020, another racially charged incident occurred involving Cpt. Corrigan and plaintiff West, during which Cpt. Corrigan falsely accused plaintiff West of engaging in behavior against Lieutenant Sodano (who is also white) that never occurred, to continue his campaign of race-based harassment and retaliation towards plaintiff West.

129.    Specifically, another senior black firefighter, plaintiff Hanna, had been assigned a detail.[13] However, it was customary that when a senior firefighter was assigned a detail, they could choose to take the detail themselves or hand it off to a less senior member.

130.    Likewise, plaintiff Hanna decided to assign his detail to another more junior black firefighter, FF Caines. Moreover, at the time, FF Hanna's supervisor, Lt. Sodano, did not initially seem to have any issue with FF Hanna assigning the detail to FF Caines, as this was often done.

131.    In connection with this detail, FF Caines left the firehouse to travel to said detail. However, at some point, FF Caines became aware that the detail was actually in another location. Likewise, FF Caines returned to the firehouse to retrieve a change of clothes and then anticipated heading out to the newly assigned location.

---

[13] Further discussion of this incident (and other racially charged incidents) appears *supra*, in plaintiff Hanna's allegations.

132.    Nevertheless, when FF Caines returned to the firehouse, with no explanation or justification, Lt. Sodano began to take issue with the assignment of the detail. In response, the firefighters in the house began to discuss their concerns about details being re-assigned.

133.    They believed that the detail issue concerning FF Caines was racially motivated and done for the sole purpose of depriving him (a black firefighter) of receiving the experience and extra pay that comes along with detail assignments.

134.    On account of this conversation, the firefighters ended up eating their meal late.

135.    Several weeks later, upon information and belief, Cpt. Corrigan and/or Lt. Sodano filed a false and pretextual complaint against plaintiff West, claiming, among other things that plaintiff West purposely caused Lt. Sodano and the other firefighters in the house to eat a late meal and that plaintiff West had "spiked" his food with hot sauce (despite the fact there was no evidence to support either contention and in fact evidence to the contrary concerning both allegations).

136.    In connection with these false allegations against plaintiff West concerning the "late" and/or "spiked" meal, in or around November of 2020, plaintiff West was called in for a meeting with Lt. Barnes.

137.    At that meeting, Lt. Barnes advised plaintiff West that Cpt. Corrigan was blaming him for the meal situation, despite there being no evidence to support said allegations. However, plaintiff West adamantly denied the allegations as the sole basis for them was on account of Cpt. Corrigan's racial animus towards plaintiff West.

138.    Following this meeting, plaintiff West was officially served with paperwork by Cpt. Fogarty concerning the "meal issue", who continued to repeat these false allegations which had been entirely concocted by Cpt. Corrigan against plaintiff West.

139.    As a result, plaintiff West was told he was going to receive a disciplinary Supervisory Conference, despite the fact there was at least one (1) other white firefighter who was working the same night that the "meal incident" had occurred, but did not receive a Supervisory Conference.

140.    Nevertheless, plaintiff West refused to sign this document as it was based on entirely false allegations and instead instituted an internal EEO complaint and Cpt. Corrigan.

141.    Further, in response to plaintiff West's EEO complaint, Cpt. Corrigan retaliated against plaintiff West by holding meetings with other white firefighters wherein he repeated these false allegations concerning the "meal incident" and told other firefighters that plaintiff West had admitted to wrongdoing (which he had not) and that was the reason why he was written up and disciplined.

142.    Following the "meal incident" and after plaintiff West filed an internal EEO complaint, between approximately November 2020 and approximately June 2021, Cpt. Corrigan and Cpt. Fogarty began to institute other changes to firehouse policies and procedures which had effects on FF West and other senior black firefighters in the house.

143.    For example, the procedure for which company (engine v. truck/ladder) leaves the house first during an emergency was changed without a conversation with the senior firefighters (most of whom are black) and in direct contravention of the way things had been done when the senior firefighters in the house were white. More importantly, this change has affected the firefighters who drive department vehicles, who are mostly black, and therefore could put them at a disadvantage for advancement.

144.    In addition, Cpt. Fogarty, Cpt. Corrigan and other white firefighters continued to engage in this biased behavior, including, but not limited to, changing procedures that negatively

affect black firefighters and refusing to meet with senior black leadership to discuss any changes, which was the norm when senior leadership was white.

145.     In addition, despite plaintiff West's and others' EEO complaints against Cpt. Corrigan and other white firefighters, this campaign of racial harassment continued. Further, as of present, plaintiff West is still unable to perform his duties as the AAOC.

***Allegations Specific to Both Plaintiffs Hanna and West***

146.     As a result of the foregoing, the environment in which plaintiff's Hanna, West, and other black firefighters work has been a hostile and difficult one.

147.     Furthermore, plaintiffs Hanna, West, and other black firefighters were *inter alia*, targeted, harassed, embarrassed, retaliated against, subjected to false allegations, reassigned, demoted, and/or disciplined as a result of this ongoing campaign of racial harassment and their compensation has been reduced as plaintiff Hanna was deprived of the opportunity to work as a chauffeur and plaintiff West was (and still is) deprived his position as the AAOC.

148.     In addition, the foregoing incidents have not only caused a financial impact on plaintiffs Hanna and West but have also caused embarrassment and mental anguish in their professional and personal lives.

149.     Defendants have engaged in unlawful discriminatory and abusive practices against plaintiffs because of their race, in violation of Federal, State, and City statutes.

150.     As a result, plaintiffs Hanna and West have suffered from embarrassment, humiliation, and emotional stress, along with lost wages and missed opportunities, causing permanent emotional damages.

**FEDERAL CLAIMS**

**FIRST CLAIM FOR RELIEF UNDER FEDERAL LAW**
**VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e – RACE DISCRIMINATION**
**(As to Defendant THE CITY OF NEW YORK)**

151.　Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

152.　Defendant THE CITY OF NEW YORK (through its employees, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO) discriminated against plaintiffs based on plaintiffs' race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

153.　Plaintiffs are African American males. As such, they belong to a protected class.

154.　As alleged herein, plaintiffs were subjected to disparate treatment in the form of threats, harassment, demotions, discipline, and/or intimidation by defendants, their agents, and employees, including defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO.

155.　Defendants subjected plaintiffs to a hostile work environment by failing and/or refusing to provide a safe environment and to employ procedures to prevent and deal with the discriminatory, disparate, and abusive threats, harassment, and intimidation by its employees, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO.

156.　By engaging in the foregoing conduct, defendants' employees, and therefore, defendant THE CITY OF NEW YORK has violated plaintiffs' rights under Title VII in that plaintiffs were disparately treated based on racial affiliation.

157.　As a consequence of the aforementioned wrongful actions, intentional, negligent, and reckless behavior, and violations of Federal, State, and City laws, plaintiffs were subjected to fear, personal humiliation and degradation, demotion, retaliation, loss of pay, and suffered and continues to suffer from mental and emotional distress.

158.    Plaintiffs suffered and continue to suffer irreparable injury and monetary damages, as well as punitive damages, costs and attorneys' fees, and other relief this Court may find just and proper.

159.    Defendant THE CITY OF NEW YORK, through its employees, acted intentionally, with malice or with reckless disregard for plaintiffs' rights, proximately causing plaintiffs' mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory and punitive damages and an award of reasonable attorney's fees.

**SECOND CLAIM FOR RELIEF UNDER FEDERAL LAW**
**VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e – HOSTILE WORK ENVIRONMENT**
**(As to Defendant THE CITY OF NEW YORK)**

160.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

161.    By engaging in the foregoing conduct, defendant THE CITY OF NEW YORK (through its employees, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO) has violated rights guaranteed to the plaintiffs under Title VII in that plaintiffs were, *inter alia*, harassed and subjected to a racially hostile work environment, as more fully detailed above.

162.    Defendant THE CITY OF NEW YORK, through its employees, acted intentionally, with malice or with reckless disregard for plaintiffs' rights, proximately causing plaintiffs mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory and punitive damages and an award of reasonable attorney's fees.

**THIRD CLAIM FOR RELIEF UNDER FEDERAL LAW**
**VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e – RETALIATION**
**(As to Defendant THE CITY OF NEW YORK)**

163.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

164.    By engaging in the foregoing conduct, defendant THE CITY OF NEW YORK (through its employees, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO) has violated plaintiffs' rights in that plaintiffs were retaliated against for opposing discriminatory practices by defendants.

165.    Defendant THE CITY OF NEW YORK, through its employees, acted intentionally, with malice or with reckless disregard for plaintiffs' rights, proximately causing plaintiffs mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory and punitive damages and an award of reasonable attorney's fees.

**FOURTH CLAIM FOR RELIEF UNDER FEDERAL LAW**
**VIOLATION OF PLAINTIFFS' RIGHTS UNDER 42 U.S.C. § 1981**
**(As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY,**
**and/or SODANO)**

166.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

167.    Plaintiffs are African American males.

168.    Defendants THE CITY OF NEW YORK (through its employees, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO) purposely discriminated against plaintiffs on the basis of race as detailed in the factual section, *supra*, and ultimately prevented from performing services under their employment contracts with the City of New York.

169.    Defendants' THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO, discrimination based on plaintiffs' race was intentional and was the substantial and/or motivating factor in interfering with plaintiffs' employment with the New York City Fire Department.

170.    As a result of the foregoing, plaintiffs sustained, *inter alia*, mental anguish, shock, fright, apprehension, embarrassment, humiliation, lost wages, interference with their employment,

and deprivation of their constitutional rights.

## PENDANT STATE CLAIMS

### FIRST CLAIM FOR RELIEF UNDER N.Y. STATE LAW
### VIOLATIONS OF NEW YORK EXECUTIVE LAW §296 – RACE DISCRIMINATION
### (As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO)

171.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

172.    The above discriminatory treatment by defendant THE CITY OF NEW YORK and/or its agents and employees, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO, violates New York State Executive Law § 296.

173.    Because of plaintiffs' race, they have been subjected to abuse and mistreatment as set forth herein and have been treated differently than other employees.

174.    As a consequence of defendants' THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO wrongful actions, intentional, negligent, and reckless behavior, and violations of Federal, State, and City laws, plaintiffs were subjected to fear, personal humiliation, and degradation, retaliation, demotion, and/or loss of pay, as well as mental and emotional distress.

175.    Plaintiffs suffered and continue to suffer irreparable injury and monetary damages, as well as punitive damages, costs and attorneys' fees, and other relief this Court may find just and proper.

### SECOND CLAIM FOR RELIEF UNDER N.Y. STATE LAW
### VIOLATIONS OF NEW YORK EXECUTIVE LAW §290 (NYSHRL) – RACE DISCRIMINATION
### (As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO)

176.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

177.    By engaging in the foregoing conduct, defendants THE CITY OF NEW YORK,

RIORDAN, CORRIGAN, FOGARTY, and/or SODANO have violated plaintiffs' rights under the NYSHRL in that plaintiffs were disparately treated based on racial affiliation.

178. Further, defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO did not treat plaintiffs the same as similarly situated Caucasian employees in violation of NYSHRL.

179. Upon information and belief, this disparate treatment of plaintiffs was motivated by racial animus and/or some other unlawful discrimination.

180. Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO acted intentionally with malice or with reckless disregard for plaintiffs' rights, proximately causing plaintiffs mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory damages.

**THIRD CLAIM FOR RELIEF UNDER N.Y. STATE LAW**
**VIOLATIONS OF NEW YORK EXECUTIVE LAW §290 (NYSHRL) – HOSTILE WORK**
**ENVIRONMENT**
**(As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY,**
**and/or SODANO)**

181. Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

182. By engaging in the foregoing conduct, defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO have violated rights guaranteed to the plaintiff under the NYSHRL in that plaintiffs were harassed and subjected to a racially hostile work environment.

183. The defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO acted intentionally, with malice or with reckless disregard for plaintiffs' rights, proximately causing plaintiff mental anguish, pain and suffering, emotional

distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory damages.

## FOURTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## VIOLATIONS OF NEW YORK EXECUTIVE LAW §290 and §296 NYSHRL) – RETALIATION
## (As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO)

184.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

185.    By engaging in the foregoing conduct, defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO have violated plaintiffs' rights under the NYSHRL in that plaintiffs were retaliated against for opposing discriminatory practices by defendant.

186.    Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO acted intentionally, with malice or with reckless disregard for plaintiffs' rights, proximately causing plaintiffs mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory damages.

## FIFTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO)

187.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

188.    Defendants' THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO discriminatory treatment of plaintiffs was intentional, reckless, extreme, and outrageous, and caused plaintiffs to suffer severe emotional distress.

189.    The emotional harm was exacerbated by defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO who threatened, harassed, and abused plaintiffs.

190.    The acts of defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO were intentionally directed at plaintiffs.

191.    The conduct of defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO was extreme, outrageous, malicious, and dangerous to the physical, mental and emotional well-being of plaintiffs, beyond the standards of civilized decency, and utterly intolerable in a civilized society.

192.    Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO knew and intended that this conduct would cause severe and extreme emotional harm to plaintiffs.

193.    As a consequence of defendants' THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO intentional wrongful actions, plaintiffs were subjected to fear, personal humiliation, and degradation, and suffered and continue to suffer economic damages as well as mental and emotional distress.

194.    Plaintiffs suffered and continue to suffer irreparable injury and monetary damages, as well as punitive damages, costs and attorneys' fees, and any other relief this Court may find just and proper.

**SIXTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY,**
**and/or SODANO)**

195.    Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

196.    Defendant THE CITY OF NEW YORK had a duty to protect plaintiffs, their employees, from emotional harm.

197.    Defendant CITY OF NEW YORK breached this duty and negligently permitted plaintiff to be injured.

198.     Plaintiffs' emotional harm was exacerbated by supervisors, defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO who threatened, harassed, demoted, and abused plaintiffs.

199.     The conduct of defendants RIORDAN, CORRIGAN, FOGARTY, and/or SODANO was extreme, outrageous, malicious, and dangerous to the physical, mental and emotional well-being of plaintiffs.

200.     As a consequence of defendants' THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO wrongful actions, plaintiffs were subjected to fear, personal humiliation, and degradation, and suffered and continue to suffer economic damages, as well as mental and emotional distress.

201.     Plaintiffs suffered and continue to suffer irreparable injury and monetary damages, as well as punitive damages, costs and attorneys' fees, and any other relief this Court may find just and proper.

## PENDANT CITY LAW CLAIMS

### FIRST CLAIM FOR RELIEF UNDER N.Y.C. LAW
### VIOLATIONS OF THE NEW YORK CITY HUMAN RIGHTS LAW (NYCHRL)(N.Y. ADMIN. CODE §8-107) – RACE DISCRIMINATION
### (As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO)

202.     Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

203.     By the acts and practices described above defendants, THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO, the defendants committed discrimination against plaintiffs by discriminating against them on the basis of race.

204.     Further, the defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO did not treat plaintiffs the same as similarly situated Caucasian

employees in violation of the NYCHRL.

205.   Upon information and belief, this disparate treatment of plaintiffs was motivated by racial animus and/or some other unlawful discrimination.

206.   As a result of the foregoing, plaintiffs sustained, *inter alia*, loss of liberty, lost wages, physical injuries, mental anguish, shock, fright, apprehension, embarrassment, and humiliation.

## SECOND CLAIM FOR RELIEF UNDER N.Y.C. LAW
## VIOLATIONS OF THE NYCHRL (N.Y. ADMIN. CODE §8-107) – HOSTILE WORK ENVIRONMENT
## (As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO)

207.   Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

208.   By engaging in the foregoing conduct, defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO have violated rights guaranteed to the plaintiff under the NYCHRL in that plaintiffs were harassed and subjected to a racially hostile work environment.

209.   The defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO acted intentionally, with malice, or with reckless disregard for plaintiffs' rights, proximately causing plaintiff mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory damages.

## THIRD CLAIM FOR RELIEF UNDER N.Y.C. LAW
## VIOLATIONS OF THE NYCHRL (N.Y. ADMIN. CODE §8-107) – RETALIATION
## (As to Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO)

210.   Plaintiffs repeat and re-allege all paragraphs above as though fully set forth herein.

211.   By engaging in the foregoing conduct, defendants THE CITY OF NEW YORK,

RIORDAN, CORRIGAN, FOGARTY, and/or SODANO have violated plaintiffs' rights under the NYCHRL in that plaintiffs were retaliated against for opposing discriminatory practices by defendant.

212.    Defendants THE CITY OF NEW YORK, RIORDAN, CORRIGAN, FOGARTY, and/or SODANO acted intentionally, with malice or with reckless disregard for plaintiffs' rights, proximately causing plaintiffs mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiffs to an award of compensatory damages.

## PRAYER FOR RELIEF

Plaintiplaintiff requests judgment as follows:

a.   Back pay and front pay;

b.   Compensatory damages;

c.   Punitive damages;

d.   Attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. §2000e-5(k), and New York State and City laws;

e.   An Order granting such other legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial for all claims stated herein.


Dated:  New York, New York
        November 2, 2022

                                              _____
                                              Gerald M. Cohen
                                              Ilyssa S. Fuchs
                                              Joshua P. Fitch
                                              Cohen & Fitch LLP
                                              *Attorneys for Plaintiffs*
                                              110 E. 59th St., Suite 3200
                                              New York, NY 10022
                                              (212) 374-9115